23CA1705 Peo v Meza-Franco 04-03-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1705
Weld County District Court No. 20CR1721
Honorable Vincente G. Vigil, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jose De Jesus Meza-Franco,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE MOULTRIE
Lipinsky and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 3, 2025

---

Philip J. Weiser, Attorney General, Grant R. Fevurly, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Adrienne R. Teodorovic, Alternate Defense Counsel, Windsor, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jose De Jesus Meza-Franco, appeals the judgment of conviction entered on jury verdicts finding him guilty of multiple counts of conspiracy to sell or distribute cocaine and one count of money laundering.  We reverse the judgment of conviction and remand for a new trial.

I.     Background

¶ 2     This case arises from a Weld County Drug Task Force investigation into a drug distribution network (the network).  During the investigation, officers lawfully obtained authorization to wiretap phone lines belonging to Jose Arellano-Arredondo, whom officers believed to be one of two people at the top of the network.  During the investigation, law enforcement identified Meza-Franco as an "alternate source" of narcotics for the network, who allowed the network to store narcotics on his property, known as the "farm."  In addition to the wiretap surveillance, officers conducted passive surveillance at locations connected to Meza-Franco and Arellano-Arredondo.

¶ 3     Based upon evidence gathered from the wiretapped phone calls (wiretap calls) and passive surveillance, the prosecution charged Meza-Franco with two counts of conspiracy to sell or

1

distribute cocaine (between 14 grams and 225 grams), one count of conspiracy to possess with intent to sell or distribute cocaine (between 14 grams and 225 grams), one count of conspiracy to sell or distribute cocaine (more than 225 grams), and one count of money laundering. Before trial, the prosecution dismissed the count of conspiracy to sell or distribute (more than 225 grams). A jury found Meza-Franco guilty on the remaining counts. The court sentenced Meza-Franco to thirty-six years in the custody of the Department of Corrections — eight years for each of the three conspiracy convictions and twelve years for money laundering, all running consecutively.

¶ 4 On appeal, Meza-Franco alleges two errors by the trial court in admitting expert testimony from Investigator Valentin Oliveros, the lead investigator on the case. Meza-Franco argues that Investigator Oliveros's testimony exceeded the scope of his expertise because it (1) went beyond merely defining and explaining narcotics-related "price[s], quantities, and terminology" and improperly relied on his factual knowledge of the investigation (dual capacity testimony) and (2) "usurped the jury's role in finding the facts" by improperly summarizing the evidence to support "[Investigator] Oliveros's belief

2

in Meza-Franco's guilt."  As discussed below, we disagree with Meza-Franco's first assertion.  With respect to his second assertion, we disagree that Investigator Oliveros improperly summarized evidence, but we agree that certain portions of Investigator Oliveros's testimony usurped the jury's role, and, as a result, we reverse Meza-Franco's convictions on the conspiracy counts.  And because, under the circumstances, proof of the conspiracy offenses was necessary to prove the money laundering charge, we also reverse that conviction.

## II.  Whether Investigator Oliveros's Testimony Exceeded the Scope of His Expert Qualification

### A.  Additional Facts

¶ 5    At trial, the court qualified Investigator Oliveros as an expert in "narcotics and culture including prices, amounts for personal use and distribution and terminology" and the Spanish language.  Investigator Oliveros testified that he was the lead agent assigned to the investigation; listened to "hundreds, if not thousands" of wiretapped calls; and pulled and reviewed recordings of calls relevant to the case before testifying.  The prosecution offered as exhibits transcripts of certain wiretap calls, each of which was

3

related to one of the charged counts against Meza-Franco. Meza-Franco did not object to the admission of the wiretap call transcripts generally. He did object to Investigator Oliveros's interpretation of the content of the wiretap calls, however, arguing that the transcripts should be allowed to "stand on [their] own without explanation" from Investigator Oliveros and that the jurors should review the transcripts to "determine on their own what they think is going on."

¶ 6 The court overruled Meza-Franco's objection, concluding that Investigator Oliveros could "opine on interpretations of coded language and may discuss the context of the investigation and . . . testify as to what he believes the conversation[s] to be about." The court also said it would instruct the jurors to "decide what weight or value they give the testimony of any experts [who] have testified at trial." Thereafter, Investigator Oliveros testified to the circumstances surrounding the transcribed wiretap calls, their content, and his interpretations of the content as it related to each charged count.

### 1. First Conspiracy Count and Money Laundering Count

¶ 7 The first conspiracy and money laundering counts corresponded to wiretap calls between June 29, 2020, and July 6, 2020. Investigator Oliveros testified he believed that Meza-Franco and Arellano-Arredondo were discussing the arrival of a shipment of cocaine because the prices and amounts they discussed were consistent with the prices and amounts of drugs officers had obtained from the network in undercover buys. Investigator Oliveros said he interpreted Meza-Franco's statement that "he w[ould] take three" to mean that Meza-Franco participated with Arellano-Arredondo in distributing cocaine to others, and Arellano-Arredondo's statement to Meza-Franco that "we can just buy the five" as reflecting a "partnership" to purchase five ounces of cocaine.

¶ 8 Investigator Oliveros also described surveillance video from Arellano-Arredondo's residence on June 30, which showed Meza-Franco's brother and a van in which an undercover officer investigating the network had previously seen Arellano-Arredondo arrive to complete a controlled drug buy.

5

¶ 9       Investigator Oliveros opined that the events in the video, along with phone calls leading up to them, were indicative "that a narcotics transaction potentially had occurred."

¶ 10      Investigator Oliveros also testified about communications between and surveillance of Meza-Franco and Arellano-Arredondo during this time that he believed demonstrated Meza-Franco was coordinating with Arrellano-Arredondo to receive and distribute cocaine.

### 2.    Second Conspiracy Count

¶ 11      The second conspiracy count related to several wiretap calls between Meza-Franco and Arellano-Arredondo on July 9, 2020. Investigator Oliveros testified that Arellano-Arredondo asked Meza-Franco about acquiring "flour," which Investigator Oliveros believed meant cocaine, and that "[Arellano-Arredondo] ha[d] a customer asking for 10," which Investigator Oliveros understood meant a customer was asking for ten ounces of cocaine. Investigator Oliveros also opined that Meza-Franco's response "that he only ha[d] five or six" but would "see if he had a different kind" meant that Meza-Franco only had a few ounces of cocaine in his possession, but that he would acquire a different batch of cocaine.

¶ 12    Investigator Oliveros also interpreted wiretap calls between Meza-Franco and Arellano-Arredondo on July 10, 2023. Investigator Oliveros opined that, during those wiretap calls, Meza-Franco and Arrellano appeared to be discussing that an individual who had "fronted" narcotics to them was requesting payment of $1,500 per ounce, but Meza-Franco and Arrellano intended to tell their source to "leave it at 12," meaning that they wanted to "relay to the source of their narcotics to try to do the ounces of cocaine for [$1,200]."

¶ 13    Based on these conversations, Investigator Oliveros opined that Meza-Franco and Arrellano-Arredondo "agreed for [Meza-Franco] to reach out to an individual he knows to be able to try and purchase two ounces of cocaine . . . [and] eventually figure[ed] out that it was [going to] cost about [$1,500] an ounce" because Arrellano-Arredondo "had a customer [who] was looking to purchase 10 ounces and [Arellano-Arredondo] didn't have enough to fill that order." Investigator Oliveros also testified "[i]t appeared that sometime after that . . . agreement conversation, [Meza-Franco] did in fact go to Mr. Arrellano's residence," which Investigator Oliveros said he believed could have been an "overt act" in

7

furtherance of the agreement to purchase the two ounces of cocaine.

### 3. Third Conspiracy Count

¶ 14 The third conspiracy count related to wiretap calls on August 8, 2020. Investigator Oliveros said Meza-Franco told Arellano-Arredondo during one wiretap call that he "still doesn't have anything," while Arellano-Arredondo said he had "paper for [Meza-Franco] to pick up," which Investigator Oliveros said meant money. Investigator Oliveros said Meza-Franco reminded Arellano-Arredondo they had "previously agreed on nine per six," meaning six ounces of cocaine for $9,000, based upon the previously discussed price of $1,500 per ounce. Meza-Franco also said that his source would soon arrive at the farm.

¶ 15 Investigator Oliveros next interpreted a wiretap call later that day in which Meza-Franco told Arellano-Arredondo there was a miscommunication about either the purity or type of cocaine they would be receiving. Mezo-Franco said that it was too expensive to purchase narcotics from an alternate source, but that he would talk to the individual the next day.

¶ 16    Based upon these wiretap calls and surveillance video of Meza-Franco's residence, Investigator Oliveros concluded that Meza-Franco was attempting to conduct a transaction for six ounces of cocaine for $9,000, but that the transaction likely didn't occur because "whatever narcotics they were [looking] at was not what they were expecting."  He also opined that Meza-Franco overtly acted to further the agreement to purchase six ounces of cocaine for $9,000 by arranging the transaction by phone.

### B.    Preservation and Standard of Review

¶ 17    We review a trial court's admission of expert testimony for an abuse of discretion.  *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011).  An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding of the law.  *Yusem v. People*, 210 P.3d 458, 463 (Colo. 2009).

¶ 18    The parties disagree whether Meza-Franco preserved his argument that Investigator Oliveros's testimony exceeded the scope of his expert qualification.  As we understand his argument, Meza-Franco asserts that Investigator Oliveros's dual capacity testimony exceeded the scope of his expertise because it (1) relied

on facts not known to the jury and summarized all of the evidence — not just the wiretap calls — concerning law enforcement's investigation of the network and (2) went beyond simply informing the jury about narcotics prices, terminology, or quantities. He asserts that he preserved his objection to the entirety of Investigator Oliveros's testimony when he "objected to the prosecution's first question eliciting summarization of the meaning of the [wiretap] calls."

¶ 19   The People assert that Meza-Franco failed to preserve the arguments he now raises on appeal regarding *how* Investigator Oliveros's testimony exceeded the scope of his expert qualification. We agree with the People. *See People v. Ujaama*, 2012 COA 36, ¶ 37 (an issue isn't preserved if the defendant didn't object, objected on different grounds than those raised on appeal, or objected on unspecific grounds that didn't alert the court to the particular issue for which review is sought).

¶ 20   If a claim wasn't preserved, we reverse only for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. A "plain error" is an error so obvious that a trial judge should be able to avoid it without an objection. *Scott v. People*, 2017 CO 16, ¶ 16.

## C.     Applicable Law

¶ 21     "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  CRE 702.

¶ 22     Expert testimony is admissible under CRE 702 if the proffered testimony is reliable, the expert is qualified to opine on such matters, and the expert testimony is relevant — meaning it is useful to the jury.  *People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001).  A trial court's reliability inquiry "should be broad in nature and consider the totality of the circumstances of each specific case."  *Id.*; *see also Brooks v. People*, 975 P.2d 1105, 1114 (Colo. 1999) (experience-based expertise is subject to the standards of CRE 702).

¶ 23     Expert testimony is useful to the jury when it assists the jury "to either understand other evidence or to determine a fact in issue."  *People v. Ramirez*, 155 P.3d 371, 379 (Colo. 2007).  A trial court must balance its discretion to allow expert witness testimony with its obligation to ensure that the probative value of the expert's

testimony is not substantially outweighed by unfair prejudice. *See id.*

### D. Discussion

#### 1. Investigator Oliveros's Testimony Didn't Rely on Facts Not Known to the Jury or Improperly Summarize Evidence About the Investigation of the Network

¶ 24 Meza-Franco alleges that the court erroneously allowed Investigator Oliveros to testify about facts not known to the jury and about the overall investigation of the network. We aren't persuaded.

¶ 25 The prosecution called several other officers to testify about law enforcement's investigation of the network, and the jury received the transcripts of the wiretap calls about which Investigator Oliveros testified. Meza-Franco fails to identify the investigatory facts to which Investigator Oliveros testified that were otherwise unknown to the jury. Thus, Meza-Franco's argument is conclusory, and we decline to address it further. *People v. Wallin*, 167 P.3d 183, 187 (Colo. App. 2007) (declining to address arguments presented in a perfunctory or conclusory manner).

12

¶ 26    We likewise reject Meza-Franco's argument that Investigator Oliveros's testimony improperly summarized evidence related to the overall investigation of the network.

¶ 27    Investigator Oliveros was one of the lead case agents assigned to the investigation of the network. In that role, he was responsible for delegating assignments to other officers and speaking with them about aspects of the overall investigation. And he was the point of contact for some of the undercover officers who made drug buys during the investigation.

¶ 28    As he was qualified as an expert witness, Investigator Oliveros was entitled to rely on information from other officers to talk about the overall course of the investigation and to form opinions about it. *See* CRE 703; *see People v. Garrison*, 2017 COA 107, ¶ 46 (when an officer's testimony about the course of an investigation relies on specialized training or knowledge, the officer must first be qualified as an expert); *see also United States v. Brooks*, 736 F.3d 921, 930-31 (10th Cir. 2013) (law enforcement expert testimony explaining how an investigation began, the law enforcement agencies involved, the investigative techniques used, or roles played by participants to a criminal enterprise is generally admissible).

¶ 29    Additionally, the prosecution's evidence, if believed by the jury, showed the complexity of the facts concerning the network's operation and Meza-Franco's alleged involvement in it.  Because a court acts within its discretion to allow a witness to provide summary testimony if it determines that the evidence is sufficiently complex such that doing so would assist the trier of fact, *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 31, we conclude that the court didn't plainly err by allowing Investigator Oliveros to summarize the information related to the overall investigation of the network.  *See generally United States v. Duran*, 941 F.3d 435, 445-46 (10th Cir. 2019) (court did not err by allowing law enforcement officer to describe the events that triggered the investigation of defendant in drug conspiracy case).

### 2.    Investigator Oliveros's Testimony Didn't Exceed the Scope of His Expert Qualification by Opining on Matters Beyond Narcotics Prices, Terminology, or Quantities

¶ 30    We also reject Meza-Franco's contention that Investigator Oliveros exceeded the scope of his expertise by testifying to issues beyond narcotics prices, terminology, or quantities.

¶ 31    Investigator Oliveros testified regarding the basis of his expertise, which included his multi-year experience as an

14

investigator for the Weld County Drug Task Force and his specialized training related to narcotics investigations. When the court qualified Investigator Oliveros as an expert, it authorized him to opine about the context of the investigation into the network, his interpretation of any coded language the participants used in the wiretap calls, and what Investigator Oliveros believed the phone conversations were about.

¶ 32 Despite Meza-Franco's argument otherwise, the court authorized Investigator Oliveros to opine more broadly than just about narcotics prices, terminology, or quantities. The court acted within its discretion to permit Investigator Oliveros's expert testimony, and such testimony — which was based on his established expertise and provided context to the investigation and included his interpretations of the evidence presented — was within the parameters of the court's authorization. *See People v. Watson*, 53 P.3d 707, 711 (Colo. App. 2001) ("Whether opinion testimony is within a particular witness's expertise generally is a matter addressed to the sound discretion of the court."); *see also People v. Munoz-Casteneda*, 2012 COA 109, ¶ 28 (when a defendant is charged with conspiracy, evidence of a drug trafficking organization

15

may be relevant because the prosecution must prove the defendant's involvement with others). Accordingly, we discern no error, let alone plain error, in the court's admission of Investigator Oliveros's testimony that, according to Meza-Franco, addressed facts not known to the jury or addressed the overall investigation of the network.

### III. Whether Investigator Oliveros's Testimony Usurped the Jury's Role

¶ 33 Meza-Franco argues that Investigator Oliveros's dual capacity testimony, which combined his expert testimony about narcotics with his personal knowledge of the investigation, "crossed the line from legitimate expert opinion" into an improper opinion on Meza-Franco's guilt. We disagree with Meza-Franco's assertion that the entirety of Investigator Oliveros's testimony was improper opinion testimony, but as we discuss next, we agree that portions of Investigator Oliveros's testimony usurped the jury's role.

### A. Additional Facts

¶ 34 After interpreting the wiretap calls related to the first and second conspiracy counts, Investigator Oliveros testified that he believed Meza-Franco entered into an illegal narcotics transaction.

16

¶ 35    During his testimony about the third conspiracy count, the prosecutor asked Investigator Oliveros, "why do you believe in your opinion that the drug that was agreed to be bought and distributed, or possessed with the intent to distribute was in fact cocaine?" Investigator Oliveros responded that he believed it was cocaine based on the discussion of the purchase price for the amount of the substance that Meza-Franco and Arrellano-Arrendondo were attempting to obtain.

¶ 36    Specifically referencing all three conspiracy counts, the prosecutor asked Investigator Oliveros to opine whether "the cocaine that was conspired to either be distributed or possessed with the intent to be distributed was . . . greater than 14 grams and less than 225 grams." Investigator Oliveros responded that, "based on those three counts, those three incidences they were talking in ounces — multiple ounces so it'd be over the 14 grams." With respect to the money laundering count, the following exchange occurred between the prosecutor and Investigator Oliveros:

> [PROSECUTOR] Now do you believe in your opinion that [Meza-Franco] and Mr. Arellano-Arredondo engaged in a financial transaction when they exchanged five ounces

17

of cocaine for $7,000 dollars on June 30th? Through [Meza-Franco's] brother[?]

[INVESTIGATOR OLIVEROS] Yes sir.

[PROSECUTOR] [Is i]t also your opinion that [Meza-Franco] completed that financial transaction with the intent to promote his further distribution of . . . cocaine, to another individual?

[INVESTIGATOR OLIVEROS] Yes.

¶ 37 Meza-Franco didn't contemporaneously object to any of this testimony, request a curative jury instruction, or request other limiting measures. On cross-examination, Investigator Oliveros conceded that he had never seen Meza-Franco in possession of drugs or money.

¶ 38 In its final instructions, the court instructed the jury that it was free to reject or accept, in whole or in part, any expert's testimony.

### B. Preservation and Standard of Review

¶ 39 Meza-Franco argues that Investigator Oliveros's testimony usurped the jury's role. The People concede — and we agree — that Meza-Franco preserved his argument that Investigator Oliveros's testimony about the content of the wiretap calls usurped the jury's role in determining Meza-Franco's guilt by objecting before

18

Investigator Oliveros began testifying. We review preserved challenges to a trial court's admission of expert testimony for an abuse of discretion and reverse only if the error was not harmless. *People v. Baker*, 2021 CO 29, ¶¶ 29, 38. An error is not harmless if it substantially influenced the verdict or affected the fairness of the trial proceedings. *People v. Martinez*, 2020 COA 141, ¶ 28.

### C. Applicable Law

¶ 40 "[T]rial courts have an obligation to serve as gatekeepers regarding the propriety of expert testimony." *Lawrence v. People*, 2021 CO 28, ¶ 43. An expert can't usurp the jury's factfinding role. *Rector*, 248 P.3d at 1203. For instance, an expert can't "tell the jury what result to reach," *People v. Collins*, 730 P.2d 293, 306 (Colo. 1986), can't "testify that he believes that the defendant committed the crime at issue," *People v. Penn*, 2016 CO 32, ¶ 31, and can't imply that the applicable legal standard has been satisfied, *People in Interest of J.R.*, 2021 COA 81, ¶ 31.

¶ 41 To determine whether an expert's testimony usurped the jury's function, we consider whether (1) the testimony was clarified during cross-examination; (2) the testimony expressed an opinion on the applicable law or legal standards; (3) the jury was properly

instructed on the law and that it may accept or reject the expert's opinion; and (4) the expert opined that the defendant committed the crime or that there was a particular likelihood that the defendant committed the crime. *Rector*, 248 P.3d at 1203. We consider this nonexhaustive list of factors in light of the totality of Investigator Oliveros's testimony to determine whether the court's admission of his testimony was erroneous. *See Lawrence*, ¶ 40 (citing *Rector*, 248 P.3d at 1203).

### D. Discussion

#### 1. The Court Erred by Admitting Portions of Investigator Oliveros's Expert Testimony

¶ 42 Primarily relying on *United States v. Dukagjini*, 326 F.3d 45, 53-54 (2d Cir. 2003), Mezo-Franco asserts the court was required to take special care in managing Investigator Oliveros's testimony to mitigate the "aura of special reliability and trustworthiness" surrounding his testimony as both an investigating officer and a narcotics expert. And we note that another division of this court has recognized that "[t]here are special concerns attendant to law enforcement expert testimony." *People v. Ornelas-Licano*, 2020 COA 62, ¶ 64 (citations omitted). But Colorado appellate courts have not

categorically prohibited law enforcement officers from providing dual capacity testimony. *See People v. Fortson,* 2018 COA 46M, ¶ 99 (noting that, while dual capacity testimony may be problematic, "in the absence of binding appellate authority condemning such testimony, it remains for the trial court to exercise its discretion to control and, in appropriate circumstances, preclude such testimony on proper objection"). Therefore, we reject Meza-Franco's contention that the court abused its discretion by not excluding Investigator Oliveros's expert testimony in its entirety because Investigator Oliveros testified in a dual capacity role.

¶ 43     Some of Investigator Oliveros's testimony indeed touched on the ultimate issues in the case. For example, when the prosecutor asked him whether he had an opinion that Meza-Franco engaged in "illegal narcotics transactions" on June 29, June 30, and July 9, 2020, Investigator Oliveros testified that he did and described each transaction in detail. But this and similar testimony didn't impermissibly and directly usurp the jury's function by concluding that the prosecution had presented sufficient evidence to prove the elements of the charged offenses.

¶ 44    However, we conclude that portions of Investigator Oliveros's testimony did cross the line from expert testimony appropriately tailored to the case's factual circumstances to improper legal conclusions under the *Rector* factors.

¶ 45    The jury was properly instructed on the law with respect to assessing Investigator Oliveros's testimony, including that it could reject or accept some or all of, and was not bound by, any expert's testimony. *See Lawrence,* ¶ 53. "Absent a showing to the contrary, we presume the jury heeded the court's instructions." *People v. Thompson,* 950 P.2d 608, 614 (Colo. App. 1997). Thus, our assessment of the third *Rector* factor weighs against a conclusion that the court reversibly erred.

¶ 46    However, in our assessment, factors one, two, and four weigh in favor of a conclusion that the court erred.

¶ 47    Factor one weighs in favor of error because — despite eliciting testimony from Investigator Oliveros that he had never observed Meza-Franco with drugs or money — defense counsel's cross-examination of Investigator Oliveros didn't clarify that, while Investigator Oliveros could provide opinions about the drug types, terminology, prices, and quantities referenced in the wiretap calls,

22

he could not affirmatively opine that his interpretation of the wiretap calls, along with Meza-Franco's actions, satisfied the legal elements of the charged offenses.

¶ 48　　This leads to factor two, which suggests that an error occurred because Investigator Oliveros expressed an opinion on the applicable legal standards.  "The crime of conspiracy is the illegal agreement to commit a crime coupled with at least one overt act in furtherance of that agreement."  *People v. Robinson*, 226 P.3d 1145, 1155 (Colo. App. 2009) (quoting *People v. Phong Le*, 74 P.3d 431, 435-36 (Colo. App. 2003)); *see also People v. Lucero*, 2016 COA 105, ¶ 26 ("To prove the requisite conspiratorial agreement to distribute drugs, the prosecution must proffer evidence of an agreement to advance further distribution of the drugs to others beyond the alleged conspirators.").  And the crime of money laundering is committed when a person (1) conducts or attempts to conduct a financial transaction; (2) knowing or believing that the property involved in that transaction represents the proceeds of a criminal offense; (3) with the intent to promote the commission of a criminal offense.  § 18-5-309(1)(a)(I), C.R.S. 2024; *Butler v. People*, 2019 CO 87, ¶ 14.

23

¶ 49    Indeed, by responding to the prosecutor's questions, which the prosecution explicitly posed in legal terms, Investigator Oliveros provided direct opinions that Meza-Franco entered into agreements with Arellano-Arredondo to sell and distribute cocaine and that Meza-Franco committed overt acts in furtherance of those agreements. For example, in response to the prosecutor's inquiry "what overt acts, if any, were carried out in furtherance" of the agreements to purchase cocaine, Investigator Oliveros described that Meza-Franco engaged in arranging the drug transactions by phone, was present on the property where the transactions occurred, and followed up with phone calls. Likewise, Investigator Oliveros provided direct opinions, using legal terms prompted by the prosecutor, that Meza-Franco and Arellano-Arredondo engaged in a financial transaction on June 30 through Meza-Franco's brother, and that Mezo-Franco completed that transaction with the intent to promote his further distribution of cocaine to another individual.

¶ 50    Factor four is also indicative of error because, in combination with Investigator Oliveros's testimony regarding the meaning of the wiretap calls, the prosecutor's specific questions prompted

Investigator Oliveros to respond that Meza-Franco completed overt acts, including placing calls in furtherance of the third conspiracy count; agree with the prosecutor that the essential elements of all three of the conspiracy counts had been satisfied; and further agree it was his opinion, with respect to the money laundering count, that Meza-Franco made an illegal agreement and completed a financial transaction with the intent to promote further distribution of three ounces of cocaine. Indeed, in response to the prosecutor's questions that used legal language, Investigator Oliveras directly opined that Meza-Franco's actions on June 30 satisfied the elements of money laundering. In doing so, Investigator Oliveros effectively testified that Meza-Franco had met each element of the conspiracy charges, all but agreeing with the prosecutor that the legal standards for conspiracy to distribute cocaine had been met and telling the jury that Meza-Franco was guilty. *See Baker*, ¶¶ 33, 34.

¶ 51 Meza-Franco's trial counsel eventually objected to this line of questioning, arguing that the prosecutor was "testifying and having the officer agree with him." Although trial counsel's objection was to the prosecution leading the witness, and not to Investigator

Oliveros's provision of improper legal opinion, we agree that the manner in which the prosecutor elicited Investigator Oliveros's testimony was improper. The prosecutor's manner of questioning Investigator Oliveros — using legal language, centered on the elements necessary prove the offenses, and asking Investigator Oliveros to identify specific evidence that satisfied those elements — resulted in Investigator Oliveros rendering improper legal opinions.

¶ 52     Further, this testimony was unnecessary because the jury could have applied Investigator Oliveras's opinions about the wiretap calls to the law to reach its own conclusions about whether Meza-Franco committed the charged offenses. Accordingly, we conclude that the court abused its discretion by admitting the portions of Investigator Oliveros's testimony in which he affirmatively agreed with the prosecutor's questioning regarding the applicable legal standard and words of the elements of the crime and responded to questioning regarding whether the elements of the crime had been satisfied because such testimony constituted improper legal opinion testimony.

## 2. The Error Wasn't Harmless

¶ 53    Because the error was preserved, the People bear the burden to show that the error was harmless. *James v. People*, 2018 CO 72, ¶ 18. The People assert that any error in the admission of Investigator Oliveros's improper legal opinion testimony was harmless because "the jury also heard from numerous officers conducting surveillance of [Meza-Franco] and Arellano-Arredondo that matched up to events discussed in the calls themselves." We disagree.

¶ 54    The prosecution's case primarily relied on Investigator Oliveros's testimony about the wiretap calls to connect Meza-Franco to the network and its distribution of cocaine. No corroborating physical evidence directly linked Meza-Franco to the distribution of cocaine, and other witnesses provided either general background information related to the network or evidence that corroborated Investigator Oliveros's interpretation of the wiretap calls, such as information about surveillance video of Meza-Franco. But that "corroborating" evidence doesn't make sense without Investigator Oliveros's testimony to contextualize it. Said another way, the factual and legal significance of Meza-Franco's words and actions

27

*only* makes sense when placed in context by Investigator Oliveros's testimony.

¶ 55      We recognize the risk that the jury possibly afforded Investigator Oliveros's improper testimony "particular weight and credibility" because he testified as an expert, was employed by the government, and testified to complex matters. *Baker,* ¶¶ 41-42; *see also Ornelas-Licano,* ¶ 64. Under these circumstances, we conclude there is a reasonable probability that Investigator Oliveros's inadmissible expert testimony substantially influenced the verdict or impaired the trial's fairness. *See Yusem,* 210 P.3d at 469. Because the court's error in allowing Investigator Oliveros's impermissible expert testimony was not harmless, we reverse Meza-Franco's convictions for conspiracy to sell or distribute (between 14 grams and 225 grams) and conspiracy to possess with intent to sell or distribute (between 14 grams and 225 grams).

¶ 56      We also reverse Meza-Franco's conviction for money laundering. Meza-Franco was charged under section 18-5-309(1)(a)(I), which required proof that Meza-Franco knowingly conducted a financial transaction with proceeds from a criminal offense, with the intent to promote the commission of another

criminal offense.  Under that section, the prosecution was required to prove the conspiracy as the underlying unlawful offense upon which the transfer of proceeds was based.  *See People v. Woodyard*, 2023 COA 78, ¶ 68 (concluding that federal courts have interpreted a substantially similar provision of the federal money laundering statute "to require proof of a covered offense" apart from the transfer of proceeds itself).  Therefore, because we have reversed Meza-Franco's conviction on the conspiracy charges, his conviction for money laundering is also necessarily reversed.

## IV.   Disposition

¶ 57      We reverse the judgment of conviction and remand for a new trial.

JUDGE LIPINSKY and JUDGE JOHNSON concur.